IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**G. THOMAS THORNTON,** *et al.*

    **Plaintiffs,**                 **Case No. 2:09-cv-585**

    **v.**                             **Judge Peter C. Economus**

**IGNAZIO "NICK" CANGIALOSI,**     **MEMORANDUM OPINION AND ORDER**

    **Defendant.**

    Plaintiffs G. Thomas Thornton and Betty Thornton brought this case against Defendant Ignazio "Nick" Cangialosi, alleging breach of a stock redemption agreement, breach of fiduciary duty, and fraudulent inducement.  In a Memorandum Opinion & Order dated May 26, 2010 (the "May 26 Order"), this Court dismissed the fraud claim.  (Dkt. 20.)  This matter is now before the Court for consideration of Plaintiffs' motion for summary judgment on the contract claim (Dkt. 28) and Defendant's motion for summary judgment on both remaining claims (Dkt. 27).  For the reasons set forth below, Plaintiffs' motion is **GRANTED,** and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

**I.**    **Background**

    On August 18, 2005, Plaintiffs agreed to exchange 100% of their ownership interest in Premium Glass Company, Inc. ("Premium") for a 10% ownership interest in Taylor Building Products, Inc. ("Taylor"), a corporation wholly owned by Defendant.  At the same time, Tom Thornton entered into an employment agreement with Taylor and the parties executed a stock redemption agreement (the "SRA").  (May 26 Order at 1.)

    In its May 26 Order, this Court noted that the SRA, which is attached as Exhibit C to Defendant's motion, "provided that Cangialosi would purchase the Thorntons' stock in Taylor

within 120 days of certain triggering events, one of which was the termination of Tom Thornton's employment." (May 26 Order 1–2.) Specifically, section 2 of the SRA provides:

> <u>Events Triggering the Call of the Stock of Thorntons</u>. At any time prior to the termination of this Agreement . . ., Cangialosi will (unless otherwise agreed to by Thorntons) buy all of Thorntons' Shares according to the terms of this Agreement, in the event that any of the following occur:
>
> a. Cangialosi gives written notice to Thorntons electing to call the Shares;
>
> b. The termination of Tom Thornton's Employment Agreement dated as of August __, 2005 (termination shall mean any significant change in the title, status or duties);
>
> c. The sale of all or substantially all of the assets of the Corporations; or
>
> d. [The transfer of stock by Cangialosi under certain circumstances].

Section 3(b) of the SRA further provides:

> In the event that Thorntons' Shares are Called for any of the reasons set forth in Section 2 of this Agreement, then Thorntons may, but is [sic] not required to, notify Cangialosi, in writing. The purchase price of the Shares shall be determined in accordance with Section 4b of this Agreement. Cangialosi shall have one hundred twenty (120) days from the date [of] the event to purchase and pay for the Shares.[1]

As this Court noted in its May 26 Order, "[e]arly in November of 2007, Tom Thornton was terminated, thereby triggering the SRA. Pursuant to the terms of the SRA, Cangialosi had 120 days to purchase and pay for Thorntons' shares of Taylor stock . . . [and] failed to do so within the time allotted." (May 26 Order 2.)

Plaintiffs also allege that Defendant breached his fiduciary duties to Plaintiffs:

> by conducting shareholder meetings without notice to Plaintiffs as minority shareholders; by withholding dividends payable to Plaintiffs as minority shareholders when otherwise paying dividends to himself; by overpaying himself

---

[1] Section 5(b) of the SRA provides that, "[i]n the event of a purchase arising from a Call for any of the reasons set forth in the Section 1 of this Agreement, then the price shall be paid in full within 180 days of the Call." Considering the context, this section apparently refers mistakenly to Section 1, rather than Section 2, and provides a contradictory deadline for the purchase of Plaintiffs' shares following a Call. This Court need not determine whether the deadline is 120 or 180 days after the date of the Call, however, because it is undisputed that Defendant would have missed either deadline.

>an inflated and unjustified management fee in excess of $30,000 per month; by refusing to allow Plaintiffs, as minority shareholders, to examine the books of Taylor, including, but not limited to, all financial and operational information[;] and by diverting corporate assets to enrich himself personally to the detriment of Plaintiffs as minority shareholders.

(Compl. ¶ 25.)

## II. Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(c)(2). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir. 2001) (citing Williams v. Int'l Paper Co., 227 F.3d 706, 710 (6th Cir. 2000)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556–57 n.7 (6th Cir. 2000).

The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56

3

(c)).  For a dispute to be genuine, the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.

## III.  Analysis

### A.  Breach of Contract

Plaintiffs allege that Defendant breached the SRA by failing to fulfill an obligation to purchase Plaintiffs' stock—an obligation Plaintiffs assert was automatically triggered by Mr. Thornton's termination.  Defendant contends that Mr. Thornton's termination did not automatically trigger an obligation under the SRA to purchase the stock and that Defendant therefore has not breached the SRA.  The parties agree that Mr. Thornton's employment was terminated and that Defendant has not purchased Plaintiffs' stock.  Therefore, if Mr. Thornton's termination automatically triggered Defendant's obligation to purchase the stock, as this Court found in its May 26 Order, the Court must find that Defendant breached the SRA.

To support his position that Tom Thornton's termination did not automatically trigger a stock purchase obligation under the SRA, Defendant maintains that, "whether the stock was put or called," "written notice to [Defendant] demanding the repurchase was required."  (Def.'s Mot. 4.)  He asserts that "[t]he SRA provides [Plaintiffs] an *option* to require a call of their shares by providing notice to [Defendant], which [Plaintiffs] never exercised."  (Id. at 7.)  Defendant points to the SRA's provision that, "[i]n the event that [Plaintiffs'] Shares are Called for any of the reasons set forth in Section 2 of this Agreement, then [Plaintiffs] may, but [are] not required to, notify [Defendant], in writing."  (SRA § 3(b).)

"In diversity actions, a federal court applies the forum state's choice-of-law provisions." Tri-Med Fin. Co. v. National Century Fin. Enters., Nos. 98-3617, 99-3062, 2000 U.S. App. Lexis 3659 at *31, (6th Cir. Mar. 6, 2000) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, (1938); Spence v. Miles Labs., Inc., 37 F.3d 1185, 1188 (6th Cir. 1994)).  Under Ohio law, "subject to

4

very limited exceptions, the law of the state chosen by the parties to a contract will govern their contractual rights and duties." Ohayon v. Safeco Ins. Co., 91 Ohio St. 3d 474, 477 (Ohio 2001). Here, the SRA provides that its terms "shall be interpreted under New Jersey law." (SRA at ¶ 9.)

Under New Jersey law, "unambiguous contracts are to be enforced as written." Grow Co. v. Chokshi, 403 N.J. Super. 443, 464 (App. Div. 2008) (citing Atlantic N. Airlines v. Schwimmer, 12 N.J. 293, 302 (1953)). Whether the terms of a contract are ambiguous is a question of law; a term is ambiguous if it is "susceptible to at least two reasonable alternative interpretations." Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (citing Kaufman v. Provident Life and Cas. Ins. Co., 828 F. Supp. 275, 282, 283 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir.1993)) (quotation marks omitted); see also Grow, 403 N.J. Super. at 476 (citing Nester, 301 N.J. Super. at 210). "To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their plain and ordinary meaning." Nester, 301 N.J. Super. at 210 (citing Kaufman, 828 F. Supp. at 283).

"A court should not torture the language of [a contract] to create ambiguity," but "must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain." Nester, 301 N.J. Super. at 210 (citing Stiefel v. Bayly, Martin & Fay, Inc., 242 N.J. Super. 643, 651 (1990); Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 27 (App. Div.1985)). In other words:

> To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the

> conduct of the parties that reflects their understanding of the contract's meaning. And once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning.

United States v. Bryant, 556 F. Supp. 2d 378, 457 (D.N.J. 2008) (citations and quotations omitted).

The Court finds that Section 3(b) of the SRA makes it clear that Plaintiffs have the option to notify Defendant of a call, in that Plaintiffs may choose whether to give notification. It does not follow, however, that Defendant's obligation to purchase the shares depends on whether Plaintiffs choose to provide such notice. Rather, the SRA states simply that, if an event triggering a call occurs, "[Defendant] will (unless otherwise agreed to by Thorntons) buy all of [Plaintiffs'] Shares according to the terms of this Agreement." (SRA § 2.) The SRA also clearly provides that the stock is called upon the occurrence of any event listed in § 2.[2] While the first event listed in § 2 includes written notice, the second event does not: it simply requires the termination of Tom Thornton's employment agreement.

As noted above, New Jersey law prohibits this Court from "tortur[ing] the language of [a contract] to create ambiguity." Nester, 301 N.J. Super. at 210. After carefully considering the language of the SRA as well as "the relations of the parties, the attendant circumstances, and the objects [the parties] were trying to attain," id., the Court finds that the SRA is not ambiguous as to whether Mr. Thornton's termination automatically triggered Defendant's obligation to purchase Plaintiffs' stock. Even considering extrinsic evidence, the language of the SRA is not susceptible to more than one reasonable interpretation. See id. The Court concludes that the provision in § 3(b) of the SRA, that Plaintiffs "may, but [are] not required to, notify [Defendant],

---

[2] The clear meaning of § 2 is supported by § 3(b) of the SRA, which begins with the phrase, "[i]n the event that [Plaintiffs'] Shares are Called for any of the reasons set forth in Section 2."

6

in writing," is independent of Defendant's obligation to purchase Plaintiffs' stock upon the occurrence of a call.

Because Tom Thornton's employment has been terminated, the stock has been called under § 2 of the SRA—whether or not Plaintiffs opted to provide notice to Defendant. Because the stock has been called, §§ 2 and 3(b) of the SRA require Defendant to purchase Plaintiffs' stock. The Court therefore finds that there is no genuine issue of material fact as to Plaintiffs' breach of contract claim. As this Court found in its May 26 Order, under the unambiguous terms of the SRA, Mr. Thornton's termination automatically triggered Defendant's obligation to purchase Plaintiffs' stock. Because Defendant did not purchase Plaintiffs' stock, he is in breach of the SRA.

For the reasons discussed below, this conclusion is unaffected by Defendant's two remaining arguments: (1) that Mr. Thornton's duties changed prior to his termination, thereby triggering a call, and (2) that Mr. Thornton admitted to the Court that he has "options to remain a shareholder."

### 1. *Changes in Mr. Thornton's Duties*

Defendant points out that, under § 2(b) of the SRA, Mr. Thornton's termination "shall mean any significant change in [his] title, status or duties." Defendant asserts that Mr. Thornton's title and employment duties were substantially modified in both 2005 and 2006. (Def.'s Mem. Opp'n 3.) According to Mr. Thornton's deposition testimony, he focused solely on manufacturing from August 2005 until June of 2006, and he was a "specialty glass sales manager" from June of 2006 until he was dismissed in November of 2007. (Thomas Thornton Dep. 224, 226–28 (Dkt. 27 at 42, 43).) However, Mr. Thornton stated in his affidavit that:

> During the course of my employment . . . my status as a director/shareholder was never changed; my title of President was never taken away or changed; my duties, as in most small to medium sized companies, required key individuals to wear

7

> several different hats. Therefore, my duties were never diminished[;] however, I may have accepted additional responsibilities in order to help the corporation in different areas.

(Thornton Aff. ¶ 10, Sept. 10, 2010 (Dkt. 36 at 19).)

Because Mr. Thornton's duties may have changed significantly in 2005 or 2006, there may be a question of fact as to whether the call provisions of the SRA were triggered prior to his termination. As Defendant suggests, a notice requirement would make the contract more clear. While the contract certainly could have been clearer, this Court will not torture the language of the SRA to insert a notice requirement. Moreover, the fact that a call may have been triggered earlier than November of 2006 does not negate the fact that a call clearly was triggered by Mr. Thornton's dismissal in November of 2006.

### 2. *Plaintiffs' "Admission"*

In Defendant's motion and in his memorandum in opposition to Plaintiff's motion, Defendant represents to the Court that Plaintiffs "admitted, in argument to this Court, that they have not exercised their option to require [Defendant] to repurchase their shares" and that Plaintiffs "represented to this Court in briefing that [Mr. Thornton] has 'options to remain a shareholder.'" (Def.'s Mot. 1; Def.'s Mem. Opp'n at 4 (both citing Atlantic Nat'l Trust, LLC v. G. Thomas Thornton and Betty L. Thornton, No. 2:09-mc-42, Dkt. 17-1 at 2).)

The Court has reviewed the filing at issue in Atlantic Nat'l Trust. It is a memorandum filed by counsel for Mr. Thornton regarding exemptions in relation to an attempted garnishment in satisfaction of judgment debt owed by Mr. Thornton. The memorandum represents to the Court that Mr. Thornton had begun "earnest negotiations . . . to compromise this debt." (No. 2:09-mc-42, Dkt. 17 at 2.) In support of that representation, Mr. Thornton's counsel attached as an exhibit "a series of relevant e-mails between the Judgment Debtor and a representative of the Judgment Creditor regarding a potential compromise of this judgment." (Id.)

The memorandum addressed to the Court is entirely devoid of reference to the issue of whether Mr. Thornton retained "options to remain a shareholder." The attached series of emails include, among many other things, a statement made personally by Mr. Thornton, apparently to a representative of the judgment creditor, that he had "options to remain a shareholder." (No. 2:09-mc-42, Dkt. 17-1 at 2.) Contrary to Defendant's own specific representation to this Court, Mr. Thornton's filing in no way constitutes an "[admission], in argument to this Court," or a "[representation] to this Court in briefing" regarding whether Mr. Thornton had an option.

Because there is no genuine question of material fact as to whether Mr. Thornton's termination automatically triggered a contractual obligation which Defendant failed to fulfill, the Court hereby **GRANTS** Plaintiffs' motion and **DENIES** Defendant's motion as to the contract claim.

### B. <u>Breach of Fiduciary Duties</u>

Plaintiffs allege that Defendant, as majority shareholder, breached his fiduciary duties to Plaintiffs, as minority shareholders, by (1) conducting shareholder meetings without notice to Plaintiffs; (2) withholding dividends payable to Plaintiffs when paying dividends to himself; (3) paying himself an inflated and unjustified management fee in excess of $30,000 per month; and (4) refusing to allow Plaintiffs to examine the books of Taylor, including financial and operational information.[3] (Compl. ¶ 25.)

Plaintiffs assert that, because the SRA is governed by New Jersey law, that state's law also controls Plaintiffs' claims for breach of fiduciary duty. (Pls.' Mem. 13 (Dkt. 37).) However, as discussed above, this Court applies Ohio's choice of law provisions. Ohio law

---

[3] Plaintiffs also allege that Defendant breached his fiduciary duties by diverting corporate assets to enrich himself personally. (Compl. ¶ 25.) As discussed below, Plaintiffs specifically allege that Defendant (i) paid himself a dividend without making a similar dividend to Plaintiffs and (ii) paid his own company an inflated management fee. Aside from these allegations, Plaintiffs have alleged no specific diversion of corporate assets to Defendant; the Court therefore will not consider this claim separately.

9

provides that "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation." Bryan v. DiBella, 2009 Ohio 1101, P13 (Ohio Ct. App. March 12, 2009) (citing First Natl. City Bank v. Banco Para el Comercio Esterior de Cuba, 462 U.S. 611, 621 (1983); State ex rel. Petro v. Gold, 166 Ohio App.3d 371 (Ohio Ct. App. March 2, 2006); RESTATEMENT OF THE LAW 2D, CONFLICT OF LAWS 332–34, § 309 (1971)). Because Taylor is a Michigan corporation, that state's law controls Defendant's fiduciary duty to Plaintiffs.

To establish a claim of breach of fiduciary duty under Michigan law, a plaintiff must establish four elements: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered damages; and (4) the damages were caused by the breach. Zamorano v. Guthikonda, No. 07-12943, 2009 U.S. Dist. Lexis 45258, *2–3 (E.D. Mich. May 29, 2009) (citing Schuster v. Sallay, 181 Mich.App. 558, 562 (1989)). To establish that a controlling shareholder breached his statutory fiduciary duty, a plaintiff must "demonstrate that . . . the controlling shareholder . . . failed to discharge [his] fiduciary duty to the minority shareholders . . . in good faith, with the care of an ordinarily prudent person in similar circumstances and in a manner reasonably believed to be consistent with the best interests of the corporation." Meyer Jewelry Co. v. Meyer Holdings, 906 F. Supp. 428, 432 (E.D. Mich. 1995) (citing M.C.L.A. § 450.1541a(1)). Under Michigan law, "[i]f a majority stockholder is in control and management of a corporation," "it is 'unlawful for [such] majority stockholder to use its fiduciary capacity to obtain access to the resources of the company for the benefit of that majority stockholder, and . . . not [for] the best interests of all of the stockholders.'" Fenestra Inc. v. Gulf Am. Land Corp., 377 Mich. 565, 559–600 (Mich. 1966) (citing Veeser v. Robinson Hotel Co., 275 Mich 133 (1936)).

The Court will address each of Plaintiff's claims for breach of fiduciary duty separately.

### 1. *Notice of Shareholder Meetings*

Mr. Thornton stated in his affidavit that Defendant conducted shareholder meetings without giving notice to Plaintiffs. (Thornton Aff. ¶ 7, Sept. 10, 2010 (Dkt. 36 at 17).) Plaintiffs' only evidence of a specific meeting for which they received no notice is a document captioned "Action By Unanimous Written Consent of the Sole Shareholder of Taylor Building Products, Inc.," dated October 27, 2005 (the "Action"). In the Action, Defendant stated, "in lieu of a meeting of the Shareholders and Directors of the Corporation . . . the undersigned, being the sole Shareholder . . . entitled to notice of such meeting, does hereby waive such notice . . . and hereby authorize by unanimous written consent" the ratification of directors and officers and the approval of a loan extension. (Thornton Aff., Ex. C-2, Sept. 10, 2010 (Dkt. 36 at 30–31).) Defendant admits that the Action was "obviously a mistake" but contends that Plaintiffs have presented no evidence that the Action adversely affected them. Plaintiffs respond that the Action increased the company's debt without their knowledge.

Without presenting evidence of specific instances, Plaintiffs appear to allege that Defendant conducted other shareholder meetings without providing notice to them. Mr. Thornton testified at his deposition that he regularly attended meetings of the Premium senior management team. (Thornton Dep. Vol. II at 92 (Dkt. 27 at 47).) Mr. Thornton also testified on December 3, 2008 that, as of the date of an unidentified previous deposition, he was included in Taylor's senior management meetings, at which he was given copies of financial statements. (Thornton Dep. Vol. III at 32–33 (Dkt. 27 at 52).) Tobin Mann, a witness for Defendant, also stated that Mr. Thornton "may have participated" in Taylor's senior management meetings prior to February of 2007, and that he believed that Mr. Thornton had "attended at least some of the Taylor meetings." (Mann Dep. Vol. III at 362, 491 (Dkt. 27 at 66, 69).) At most, the testimony

11

establishes that Mr. Thornton regularly attended Premium meetings and, following the date of a previous deposition, he also regularly attended Taylor meetings.  (Def.'s Reply at 12.)

Michigan law requires corporations to provide shareholders with notice of shareholder meetings.  See Darvin v. Belmont Indus., Inc., 40 Mich. App. 672, 684 (Mich. Ct. App. 1972).  As the controlling shareholder, Defendant had a duty to provide such notice to Plaintiffs.  Considering the conflicting evidence discussed above, the Court finds a genuine issue of material fact as to whether Defendant breached that duty and thereby caused harm to Plaintiffs.  Defendant's motion is therefore **DENIED** as to this claim.

### 2. *Withholding Dividends*

According to the testimony of Barbara Krogulecki, Taylor's Vice President of Finance, a dividend of $50,000 was paid to Defendant in April of 2006, while no dividend was paid to Plaintiffs.  (Krogulecki Dep. 3–4, 11 (Dkt. 27 at 98; Dkt. 36 at 41).)  Defendant denies that any such dividend was paid.  (Def.'s Reply at 13.)

As discussed above, a controlling shareholder has duty to exercise his fiduciary capacity for the benefit of all of the shareholders, not only for himself.  Fenestra, 377 Mich. at 559–600.  More specifically, in the absence of a contrary agreement between shareholders, "[d]ividends among shareholders of the same class generally must be distributed on a pro rata basis without discrimination or preference.  In other words, the board of directors cannot pay dividends only to certain shareholders to the exclusion of others of the same class."  11 FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5352 (2011); see Allied Supermarkets, Inc. v. Grocers Dairy Co., 391 Mich. 729, 736 (Mich. 1974) ("a corporation need not pay out its dividends on only a prorata basis if another basis has been adopted by unanimous consent of the stockholders").

The Court finds that there is a genuine question of material fact as to whether Taylor issued a dividend or other distribution to Defendant while making no such dividend or distribution to Plaintiffs. Because such an action would be a breach of Defendant's fiduciary duty and would cause damage to Plaintiffs, Defendant's motion for summary judgment is **DENIED** as to this claim.

### 3. *Management Fee*

According to Mr. Thornton's affidavit, Defendant paid himself an annual management fee of $300,000 in addition to his salary of $150,000. Mr. Thornton opined that this fee was "outrageous" and alleged that the fee was not disclosed to Plaintiffs. (Thornton Aff. ¶ 8, Sept. 10, 2010 (Dkt. 37 at 27).) Defendant does not dispute that such a management fee was paid, but states that it was paid to "[Defendant's] management company, Inc. Industries, out of which [Defendant] apportioned the cost of his office expenses, secretary, and general overhead." (Def.'s Reply at 13–14.) Defendant asserts that the business judgment rule applies and that "[s]uch payments were entirely within the sound discretion of the board of directors, and therefore[] do not constitute a breach of fiduciary duty." (Id. at 14.)

However, "[t]he business judgment rule governs only where the directors are not shown to have a self-interest in the transaction at issue." Plaza Sec. Co. v. Fruehauf Corp., 643 F. Supp. 1535, 1543 (E.D. Mich. 1986) (quoting Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 265 (2d Cir. 1984)). If a plaintiff demonstrates that self-dealing has occurred, "the duty of loyalty supersedes the duty of care, and the burden shifts to the directors to prove that the transaction was fair and reasonable to the corporation." Id. (quoting Norlin Corp., 744 F.2d at 265) (quotations omitted).

The Court finds that, because Defendant appeared on both sides of the transaction in which he caused Taylor to pay a management fee to Defendant's own company, this transaction

13

is not subject to the business judgment rule. Rather, Defendant carries the burden to prove that the transaction was fair and reasonable to Taylor. Considering the scant but conflicting evidence, the Court finds that a genuine question of material fact exists as to whether the transaction was fair to the company. Because a question exists as to whether Defendant breached his fiduciary duty to act in the best interests of the company and thereby caused harm to Plaintiffs, Defendant's motion is **DENIED** as to this claim.

### 4. *Access to Books*

At his October 14, 2008 deposition, Mr. Thornton testified that he was given operational and financial information "happenstance and/or *when [he] demanded it*," but did not have the information "in every instance." (Thornton Dep. Vol. II at 49–50 (Dkt. 27 at 48–50) (emphasis added).) At his December 3, 2008 deposition, he testified that, monthly for the previous nine months, he had received Taylor financial records generated by Barb Krogulecki. (Thornton Dep. Vol. III at 27–28 (Dkt. 27 at 51).) He testified that he "did have a problem" with access to financial statements before that period, starting with the acquisition in August of 2005. (Id.) He also testified that, since his deposition on October 14, 2008, he had been included in Taylor's senior management meetings, where he was given copies of financial statements. (Id. at 32–33 (Dkt. 27 at 52).)[4]

Plaintiffs allege only one instance in which Defendant refused to provide information to them. As reflected in a string of emails dated in May of 2007, Mr. Thornton had requested cost analyses on a specific program, and Defendant had refused to disclose the analyses, stating that it was company policy not to "forward cost analyses to anyone including the sales department and internally" because the "analyses are proprietary information and [he] [did not] want [] them to

---

[4] Mr. Thornton also testified that he had been given access to financial statements beginning in March or April of 2007. It is not clear whether he referred only to Premium statements or to statements of both Taylor and Premium. (Thornton Dep. Vol. III at 32–33 (Dkt. 27 at 52).)

14

get into the hands of any competitors, suppliers or customers." (Thornton Aff. Ex. C-10, Sept. 10, 2010 (Dkt. 37 at 48).)

Taken as a whole, Mr. Thornton's testimony appears to indicate that, with the exception of certain cost analysis information, Taylor's financial records were provided to Plaintiffs when demanded. As for the cost analysis information, Plaintiffs have identified no authority to support a duty to provide such information. The Court therefore finds that there is no genuine question of material fact as to whether Defendant breached his fiduciary duty to provide Plaintiffs with the company's records. Defendant's motion is therefore **GRANTED** as to Plaintiff's claim for failing to grant access to corporate records.

**IV. Conclusion**

For the reasons discussed above, the Court hereby **GRANTS** Plaintiffs' motion for summary judgment on the contract claim (Dkt. 28), **GRANTS IN PART** Defendant's motion as to Plaintiff's claim that Defendant breached his fiduciary duty by refusing to allow Plaintiffs to examine corporate records (Dkt. 27), and **DENIES IN PART** Defendant's motion as to every other claim (Dkt. 27). Because the Court's decision does not rely on the Second Declaration of Ignazio Cangialosi, the Court need not address Plaintiffs' Motion to Strike And/Or Disregard Certain Affidavit Testimony of Defendant Nick Cangialosi (Dkt. 35), which is hereby **DENIED** as moot.

**IT IS SO ORDERED.**

                                              /s/ Peter C. Economus  -  March 29, 2011
                                              **UNITED STATES DISTRICT JUDGE**